1539

**FILED**

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JUL 17 2018

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

| | | |
|---|---|---|
| The United States of America, the States of Connecticut, Delaware, Georgia, Maryland, New Hampshire, New York, North Carolina, Rhode Island, the Commonwealth Massachusetts, the Commonwealth of Virginia, and Vermont, and the District of Columbia *ex rel.* Lawrence LaBenne, | : : : : : : : : : | Civil Action No. 18-925 <br><br> Hon. |
| Plaintiffs, <br> v. | : : : | **FILED IN CAMERA AND** <br> **UNDER SEAL PURSUANT TO** <br> **31 U.S.C. § 3730(b)(2)** |
| Koninklijke Ahold Delhaize N.V., Koninklijke Ahold N.V., Delhaize Group, N.V./S.A., Ahold USA, Inc., Delhaize America, LLC, Giant Foods Stores, LLC., the Stop & Shop Supermarket Company LLC, Giant Food of Maryland LLC, Hannaford Bros. Co., LLC, and Food Lion LLC, | : : : : : : : : | JURY TRIAL DEMANDED |
| Defendants. | | |

## *QUI TAM* COMPLAINT

*Qui tam* Plaintiff-Relator, Lawrence LaBenne, R.Ph., through his attorneys Pietragallo Gordon Alfano Bosick & Raspanti, LLP, and on behalf of the United States of America, the States of Connecticut, Delaware, Georgia, Maryland, New Hampshire, New York, North Carolina, Rhode Island, and Vermont, the Commonwealths of Massachusetts and Virginia, as well as the District of Columbia, hereby files this Complaint under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the operative state false claims statutes. In support of this action, and based on personal knowledge and relevant documents, Relator alleges:

## I.   **INTRODUCTION**

1.   This is an action to recover damages and civil penalties on behalf of the United States of America and the States of Connecticut, Delaware, Georgia, Maryland, New

Hampshire, North Carolina, Rhode Island, and Vermont, the Commonwealths of Massachusetts and Virginia, as well as the District of Columbia, arising from the submission of false and fraudulent claims and false records and statements due to the unlawful conduct of Defendants Koninklijke Ahold Delhaize N.V., Delhaize Group, N.V./S.A., Koninklijke Ahold N.V., Ahold USA, Inc., Delhaize America, LLC, Giant Foods Stores, LLC., the Stop & Shop Supermarket Company LLC, Giant Food of Maryland LLC, Hannaford Bros. Co., LLC, and Food Lion LLC.

2.    Defendants are the owners and operators of Giant Food Stores, Martin's Food Stores, Stop & Shop, Food Lion, and Hannaford, sister chains of grocery stores that operate, through thousands of locations, in Connecticut, Delaware, Georgia, Kentucky, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, and the Commonwealth of Virginia, as well as the District of Columbia. Many of the stores contain a pharmacy owned and operated by the same Defendants.

3.    Koninklijke Ahold Delhaize N.V. is the parent company (or successor entity) of the other Defendants in this action. The company is the result of a merger between Delhaize Group, N.V./S.A. (operators of the Giant, Stop & Shop, and Martin's grocery/pharmacy chains) and Koninklijke Ahold N.V. (operators of the Food Lion and Hannaford grocery/pharmacy chains).

4.    This action concerns a drug pricing fraud scheme related to Defendants' prescription drug discount programs, whereby Defendants offered cash payers (i.e. those not paying through insurance), and thus to the general public, deeply discounted prices on thousands of drugs. At Ahold USA, Inc.'s pharmacies (under the Martin's, Giant, and Stop &

Shop brands), for example, this program was called the "Prescription Savings Program" or "Prescription Savings Plan" ("PSP"), although substantially similar programs were in place at Defendants' other chains as well, albeit under different names. The discounted prices offered through these programs amounted to Defendants' "usual and customary charges to the general public" ("usual and customary charge" or "U&C"), which is a term used in the health insurance and pharmacy space to mean the prices offered to cash payers.

5.    While the law is clear that pharmacies cannot typically charge government insurers like Medicare, TRICARE, and Medicaid *more than* the pharmacy's usual and customary charge, for drugs covered by the PSP (or analogous programs), Defendants systematically charged government insurers rates far in excess of their usual and customary charges. In some cases, for example, Relator saw that the charges that Martin's pharmacy submitted to Medicare were inflated by *over 1,000%* over the proper charge. These programs were in place from at least 2013 through September 13, 2017.

6.    Government insurers have paid grossly excessive sums for the numerous drugs that are discounted through the PSP and related programs. This scheme is referred to as "the usual and customary pricing fraud." By virtue of Defendants' systemic overcharges, Defendants have caused substantial harm to Medicare, TRICARE, and Medicaid and violated the Federal False Claims Act and its state law and District of Columbia law counterparts.

7.    Moreover, beginning in at least 2010, Ahold's pharmacy chains also provided, and continue to provide, a price match guarantee program which provides prescription drug prices at a match with competitor's prices. Ahold did not incorporate the price match guarantee pricing into its usual and customary prices, causing similar overcharges to government health programs.

## II.    JURISDICTION AND VENUE

8.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* Defendants do business in the Western District of Pennsylvania, and throughout the states of Connecticut, Delaware, Georgia, Maryland, Maine, Massachusetts, New Hampshire, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, and the Commonwealth of Virginia. The acts proscribed by 31 U.S.C. § 3729(a) and described in this *Qui Tam* Complaint occurred in the Western District of Pennsylvania and elsewhere in the United States.

9.    Subject matter jurisdiction over this *qui tam* action is conferred by 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3730(b) and 3732(a).

10.    Relator has made the necessary voluntary disclosures to, and filed all necessary documents with, the United States government as required by 31 U.S.C. § 3730(b)(2). Relator has also made all voluntary disclosures to the States of Connecticut, Delaware, Georgia, Maryland, Massachusetts, New Hampshire, New York, North Carolina, Rhode Island, Vermont, and Virginia, as well as the District of Columbia, prior to the filing of this lawsuit and has filed all necessary documents with those states as required by their FCAs.

11.    There has been no public disclosure of the "allegations or transactions" in this Complaint under Section 3730(e) of the federal FCA or under analogous provisions of the named state FCAs.  The specific facts, circumstances, and allegations of the Defendants' violations of the federal and state FCAs have not been publicly disclosed in a civil suit or administrative civil money penalty proceeding in which the government is already a party. Moreover, Relator would qualify as an "original source" of the allegations in this *Qui Tam*

Complaint under 31 U.S.C. § 3730(e), and under provisions of the relevant state FCAs had such a public disclosure occurred.

12. The Court has personal jurisdiction over all of the Defendants because 31 U.S.C. § 3732(a) authorizes nationwide service of process and because the Defendants have minimum contacts with the United States, and can be found in, and transact or have transacted business in, the Western District of Pennsylvania.

13. Defendants regularly dispense prescription medication, perform pharmacy services, and submit or cause the submission of claims for payment for prescription medications to federal and state healthcare programs, including, but not limited to, Medicare, Medicaid, and TRICARE. Accordingly, they are subject to the jurisdiction of this Court.

14. Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because Defendants can be found in, or transact business in, the Western District of Pennsylvania, and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

15. The Court has jurisdiction over Defendants' violations of the state and District of Columbia FCAs pursuant to 31 U.S.C. § 3732(b), because Defendants' violations of these state and D.C. laws and their violations of the federal FCA arise from the same transactions or occurrences.

16. Alternatively, the Court has supplemental jurisdiction over the causes of action brought under the laws of the states and the District of Columbia, pursuant to 28 U.S.C. § 1367, because the claims arise from the same facts forming the basis of the action brought under 31 U.S.C. § 3730.

## III.  THE PARTIES

### A. Relator LaBenne

17.  Relator Lawrence LaBenne is an individual residing in DuBois, Pennsylvania, within the Western District of Pennsylvania, and he brings this action on behalf of the United States of America, the States of Connecticut, Delaware, Georgia, Maryland, Massachusetts, New Hampshire, New York, North Carolina, Rhode Island, Vermont, and Virginia, as well as the District of Columbia.

18.  Relator holds a Bachelor of Science degree from Clarion University, which he obtained in May 2002, and a Doctor of Pharmacy degree, which he earned from the University of Pittsburgh in December 2006. Since January 2007, he has been a licensed and registered pharmacist in the State of Pennsylvania.

19.  Relator is a Staff Pharmacist at the Martin's pharmacy located at 22 Hoover Avenue, DuBois, Pennsylvania 15801 (the "DuBois Martin's Pharmacy"). He has worked in that capacity at the DuBois Martin's Pharmacy since March 2010 and during the entire relevant period of the fraudulent activity detailed in this Complaint.

20.  Defendants' Staff Pharmacists, such as Relator, are salaried management. However, they have only limited supervisory authority over the pharmacies in which they work or other pharmacy employees. They cannot institute training, make policy, or determine prices. The drug prices charged to insurers are automatically entered into Defendants' pharmacy computer system and thus Defendants, not their individual pharmacists, set the price that is charged to insurers.

21.  All pharmacies operated by Ahold-Delhaize use the same electronic pharmacy claim system, called EnterpriseRx, which submits claims to insurers and determines the prices

charged to insurers and individual patients.

22.    As a Staff Pharmacist, Relator was part of an email distribution list that received significant correspondence regarding the scheme from those within corporate pharmacy management hierarchy.

23.    Relator also filled prescriptions, and received and reviewed documents reflecting Defendants' usual and customary pricing scheme.  Relator was privy to the claims processing system that Defendants used to process pharmacy claims under the PSP and reviewed the inflated prescription drug claims submitted to government insurers.

**B. The Defendants**

24.    Defendant Koninklijke Ahold Delhaize N.V. ("Ahold Delhaize") is a Netherlands for-profit public company, a "naamloze vennootschap" (in English, a "nameless partnership") under Dutch law, with its principal place of business in Zaandam, Netherlands.  The company was created as a result of the 2016 merger of Defendants Koninklijke Ahold N.V and Delhaize Group, N.V./S.A.  Prior to the merger, Koninklijke Ahold N.V, a Dutch company, operated grocery stores and pharmacies in the United States through its Stop & Shop, Giant, and Martin's brands. Meanwhile, Delhaize Group, N.V./S.A., a Belgian company, operated grocery stores and pharmacies in the United States through the Food Lion and Hannaford brands. These brands are now all owned and operated through the merged entity Ahold Delhaize.

25.    Ahold Delhaize, like its predecessor entities, operates retail store chains, including grocery store chains with pharmacies, around the world.

26.    Ahold Delhaize's United States' sales amounted to 61% of the company's net sales in 2017.  Ahold Delhaize's United States net sales for 2017 were approximately $47.5 billion. Ahold Delhaize's annual sales attributed to pharmaceutical drugs exceed $1 billion per year.

27.     Defendant Ahold USA, Inc. is one of Ahold Delhaize's United States subsidiaries. It is incorporated in Delaware and has a principal place of business in Quincy, Massachusetts, from where it operates grocery store chains including Giant, Martin's, and Stop & Shop. Collectively, Koninklijke Ahold N.V. and Ahold USA are referred to herein as "Ahold."

28.     Delhaize America, LLC is a North Carolina-based subsidiary of Ahold Delhaize. It operates the Food Lion and Hannaford grocery chains through their attendant subsidiaries, the North Carolina-headquartered Food Lion, LLC and the Maine-headquartered Hannaford Bros. Co., LLC.

29.     Defendant Giant Food Stores, LLC is a wholly-owned subsidiary of Ahold Delhaize and was owned and operated by Ahold USA prior to the Ahold/Delhaize merger. It is a Pennsylvania limited liability corporation with its principal place of business in Carlisle, Pennsylvania. Giant Food Stores, LLC operates Giant food stores and Martin's food stores in Pennsylvania, Maryland, Virginia, and West Virginia.

30.     Defendant Giant Food of Maryland, LLC is owned by Ahold Delhaize and was owned and operated by Ahold USA prior to the Ahold/Delhaize merger. It is a Maryland limited liability corporation with its principal place of business in Landover, Maryland. Giant Food of Maryland, LLC operates Giant food stores in Maryland, Delaware, Virginia, Washington, D.C., and West Virginia.

31.     Defendant Stop & Shop Supermarket Company LLC is owned by Ahold Delhaize and was owned and operated by Ahold USA prior to the Ahold/Delhaize merger. It is a Massachusetts based limited liability company with its principal place of business in Quincy, Massachusetts. It operates Stop & Shop grocery stores in Connecticut, Massachusetts, New Jersey, New York, and Rhode Island

32.    Following the 2016 Ahold/Delhaize merger, all the subsidiary components and brands of the Ahold and Delhaize predecessor companies are owned and operated by Ahold Delhaize.

33.    Through these various brands, Ahold Delhaize operates around 1,960 grocery stores in the United States.  Ahold Delhaize operates pharmacies within many of these grocery stores, as set out below.

34.    Martin's pharmacies are located in Virginia, Maryland, and Pennsylvania.

35.    Giant pharmacies are located in Virginia, Delaware, Maryland, Massachusetts, Pennsylvania, and Washington, D.C.

36.    Stop & Shop pharmacies are located in Connecticut, Massachusetts, New Jersey, New York, and Rhode Island.

37.    Food Lion pharmacies are located in North Carolina, South Carolina, Virginia, and Georgia.

38.    Hannaford pharmacies are located in Maine, Massachusetts, Vermont, and New Hampshire.

39.    The usual and customary pricing scheme set out herein concerns all of Defendants' American grocery-pharmacy brands: Stop & Shop, Martin's, Giant, Food Lion, and Hannaford.

## IV.    THE APPLICABLE LAW

### A.    The Medicare Part D Program: Prescription Drug Coverage

40.    The Medicare Part D Program provides beneficiaries with assistance in paying for out-patient prescription drugs.  This benefit was added to Medicare by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. §§ 1395w-101 *et seq.*

41.  Persons entitled to Medicare benefits under Part A or enrolled in Part B are eligible for Medicare drug benefits under Part D. *Id.* § 1395w-102.

42.  When a Medicare Part D beneficiary fills a prescription at a pharmacy, the pharmacy submits a Prescription Drug Event claim to the Medicare Part D Plan Sponsor, an entity that contracts with the Centers for Medicare and Medicaid Services to provide Part D benefits. The Part D Plan Sponsor, in turn, submits the claim to CMS for payment. The claim may also be submitted to a pharmacy benefit manager ("PBM"), an intermediary acting with and on behalf of the Part D Plan Sponsor to provide managerial services for the Part D benefit.

## B.  MEDICAID

43.  Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people. Medicaid is a cooperative federal-state public assistance program which is administered by the states.

44.  Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is substantial. For example, the federal government provides greater than 50% of the funding for the Medicaid program in Georgia. Funds not provided by the federal government are provided by the state. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

45.  Medicaid reimburses healthcare providers for covered prescription drugs.

## C.   **TRICARE**

46.   CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a healthcare program for the families of veterans with a 100 percent service-connected disability.

## D.   **The Federal False Claims Act**

47.   The federal FCA imposes liability on any person who:

> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C)   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D)   has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E)   is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

> (F)   knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

> (G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

11

transmit money or property to the Government,

31 U.S.C. § 3729.

48. Each violation of the federal FCA triggers a civil penalty, plus three times the amount of damages sustained by the government as a result of the violation. *Id.*; 64 Fed. Reg. 47099-47104, § 85.3.

### E.    The Operative Federal and State Drug Pricing Laws

### 1.    Pricing Definitions

49. Under Medicare, TriCare, and Medicaid, government insurers pay prescription drug claims at the lesser of various alternative pricing metrics.

50. The potentially applicable drug pricing metrics that may govern a Medicare, TriCare, or Medicaid prescription drug claim include:

a. The "Usual and Customary Charge to the General Public" or, simply, the "usual and customary price" ("U&C") is the price offered by a pharmacy to those who pay for prescription drugs on a cash basis (i.e. without insurance). *See, e.g.*, 42 C.F.R. § 423.100 (noting, in respect to Medicare, that the "[u]sual and customary (U&C) price means the price that an out-of-network pharmacy or a physician's office charges a customer who does not have any form of prescription drug coverage for a covered Part D drug."). This price will incorporate the lowest price available to the public, be it through a drug discount program or price match guarantee;

b. The Average Wholesale Price ("AWP") is typically defined as the drug manufacturer's listed price for a drug sold to a wholesaler and may be determined in accordance with Red Book, a pharmaceutical industry pricing

publication;

c.  The Estimated Acquisition Cost ("EAC") is a pricing metric based upon a drug's AWP discounted by a certain percentage or the drug's Wholesale Acquisition Cost ("WAC") plus a certain percentage;

d.  The Actual Acquisition Cost ("AAC") is the cost a pharmacy incurs in purchasing a drug from a wholesaler or manufacturer;

e.  The National Average Drug Acquisition Cost ("NADAC") is a pricing metric used by certain Medicaid agencies based on pharmacy invoicing surveys;

f.  The Federal Upper Limit ("FUL") is a specific limit that CMS sets for certain multiple-source drugs (i.e. drugs where generics are available);and

g.  The Maximum Allowable Cost ("MAC") is a pricing limit a state may create and use as an alternative to the FUL.

51.  Many states, as is pertinent here, Vermont, North Carolina, South Carolina, Maine, Maryland, and Virginia as well as the District of Columbia, leave the "usual and customary" term otherwise undefined and accordingly its ordinary meaning, the lowest price a pharmacy offers to cash payers, is applicable. 12-7 Code Vt. R. § 5: 7501.3, North Carolina Division of Medical Assistance Outpatient Pharmacy Medicaid and Health Choice Clinical Coverage Policy 9, South Carolina Healthy Connections (Medicaid) Provider Manual: Pharmacy Services, 1-21, MaineCare Benefits Manual, Code Me. R. tit. 10-144 Ch. 101, Ch. 2, § 80.09, Code Md. Regs. 10.09.03.07 (F.), 12 Va. Admin. Code 30-80-40, CDCR § 29-2710.5(a)-(b) (prior version effective March 12, 2013).

52.  Other states, including certain of the Plaintiff states, have further clarified that the prices offered pursuant to drug discount programs are the pharmacy's "usual and customary"

13

price. These definitions of the "usual and customary" price do not abrogate the "price offered to cash payers" definition. These definitions are set out, in pertinent part, as follows.

a. **Connecticut** sets out, by statute, that:

> A pharmacy provider enrolled in any medical assistance program administered by the Department of Social Services, when billing the department for a good or service, **shall bill the department the lowest amount accepted from any member of the general public who participates in the pharmacy provider's savings or discount program.** For purposes of this section, "savings or discount program" means any program, club or buying group offered by a pharmacy provider to any member of the general public for the purpose of obtaining a lower charge for any good or service than the charge made to any member of the general public who does not participate in such program.

Conn. Gen. Stat. § 17b-226a (emphasis added).

b. The **Delaware** Medical Assistance Program Pharmacy Provider Policy Manual,

§ 4.1.4 states that the "usual and customary charge" is:

> the lower of [the]
> • amount charged to a cash paying customer
> • **amount charged to customers enrolled in the provider's discount program**
> • contracted rates with Delaware State employees groups [or]
> • contracted rates for any Federal employee groups

*Id.* § 4.1.4.1 (emphasis added).

c. **Georgia** Medicaid defines the "usual and customary charge" term as follows:

> For-profit providers must submit their usual and customary charge when billing the Division for Medicaid prescriptions. The Division defines usual and customary as **the lower of** the lowest price reimbursed to the pharmacy by other third party payers (including HMO's); or, **the lowest price routinely offered to any segment of the general**

14

> **public. For example, if a pharmacy offers discounts to Senior Citizens or children, the same discounted price must be billed to the Division.** Likewise, a pharmacy that provides prescription refills at no charge must not bill the Division for a refill provided to a Medicaid member. Donations or discounts provided to a charitable organization or fees charged to or paid by federal or state funded programs are not considered usual and customary charges.

Georgia Department of Community Health Division of Medical Assistance, Policies and

Procedures for Pharmacy Services, Part II, Section 1001 (emphasis added).

> d. **Massachusetts** defines "usual and customary charge" by regulation as:

> > The **lowest price that a provider charges or accepts from any payer** for the same quantity of a drug on the same date of service, in Massachusetts, including but not limited to the shelf price, **sale price,** or advertised price for any drug including an over-the-counter drug. If an insurer and the provider have a contract that specifies that the insurer will pay an average or similarly computed fixed amount for multiple therapeutic categories of drugs with different acquisition costs, the fixed amount will not be the provider's usual and customary charge.

101 Code Mass. Regs. 331.02 (emphasis added).

> e. **New Hampshire** law sets out that:

> > Except as specified in subparagraph III(c), the term 'usual and customary' means the **lowest charge, fee, or rate charged by a provider for any product** or service at the time such product or service was provided. For the purpose of determining the lowest charge, fee, or rate: (1) **If the provider offers discounts or rebates, then the amount after applying discounts or rebates shall be utilized** . . .

N.H. Rev. Stat. § 126-A:3 (III)(b) (emphasis added).

f. **Pennsylvania** has, by regulation, defined "usual and customary charge" as

follows:

> The **pharmacy's lowest net charge** an MA
> [Medical Assistance] recipient would pay for a
> prescription as a non-Medicaid patient at the time of
> dispensing for the same quantity and strength of a
> particular drug or product, **including applicable
> discounts**, such as special rates to nursing home
> residents, senior citizens, or **other discounts
> extended to a particular group of patients,
> including generic drug discount and savings
> programs**. This lowest net price does not apply to
> special in-store rates or discounts extended to
> charitable organizations, religious groups, store
> employees and their families, nonprofit
> organizations, members of the medical profession
> or other similar non-Medicaid groups.

55 Pa. Code § 1121.2 (emphasis added).

g. **Rhode Island** law states:

> The term **"usual and customary" means the
> lowest charge, fee, or rate charged by a provider
> for any product or service** at the time such product
> or service was provided. For the purpose of
> determining the lowest charge, fee, or rate:
> **(1) If the provider offers discounts or rebates,
> the amount after applying discounts or rebates
> shall be utilized;**
> (2) If the provider offers a sale for a limited period
> of time on any good or service, the sale price shall
> be utilized during the sale period;
> **(3) If the provider regularly accepts less than its
> full charge from any customer, that amount
> accepted shall be utilized;**
> (4) If any good or service is offered free of charge
> by the provider, no charge shall be made to the
> department for the provision of the product or
> service to the department or a client of the
> department who satisfies the terms of the offer;
> (5) If any good or service is covered under any
> warranty or guarantee offered by the provider, the
> amount charged to the department shall not exceed

16

> the amount which would otherwise be payable solely by the customer; and
>
> (6) If a provider structures or packages its goods or services in a manner which is exclusively or primarily used for Medicaid, Medicare, or other third-party payors, the charge for the most similar good or service offered to any other consumer shall be utilized.

40 R.I. Gen. Laws § 40-8-4.1(b) (emphasis added).

### 2. The Pricing Framework for Medicare, TRICARE, and Medicaid

53.   Where the usual and customary price is the lowest of the various alternative pricing metrics, a pharmacy must submit a charge to Medicaid, and be reimbursed, at the usual and customary price. *See* 42 C.F.R. § 447.512 & *infra* ¶¶ 66-68. For out of network claims under Medicare Part D, the usual and customary price is the price ceiling. Under Medicare Part D for in-network claims, the contract between the Part D Plan (or PBM) and the in-network pharmacy generally employs the usual and customary price as a price ceiling.

54.   Given that a pharmacy cannot typically be reimbursed by Medicare or Medicaid beyond the usual and customary charge, the usual and customary price ceiling acts, in practice, like a price match guarantee for government insurers. If a pharmacy offers its drugs to cash payers at a discount (and that price is below the relevant alternative pricing metrics), the pharmacy must provide that same price for government-insured patients. As set out below, Defendants have, throughout the relevant period, systematically failed to honor that guarantee. As a result, Defendants have submitted or caused to be submitted grossly excessive charges to Medicare, Medicaid, and Tricare.

### Medicare

55.   For Medicare, 42 U.S.C. § 1320c-5(a)(1) sets out that medical providers must provide their services economically. When Defendants submit charges for prescription drugs

far in excess of their usual and customary charges, they fail to abide by that mandate.

56. Relatedly, a provider is generally prohibited from submitting (or causing the submission of) claims for reimbursement to federal healthcare programs that are "substantially in excess of [the] individual's or entity's usual charges." 42 U.S.C. § 1320a-7(a)(6). Entities that fail to abide by that mandate face exclusion from federal healthcare programs. *Id.*

57. For Medicare, prescription drugs are generally provided through a private entity, called a Part D plan (or Part D sponsor). In such cases where a pharmacy is in-network, the operative drug pricing framework is set out through a contract between a Part D plan (or an intermediary like a PBM) and an in-network pharmacy, which typically mandates that Medicare Part D will pay the lowest of various pricing metrics, including the usual and customary charge.

58. For example, the following Part D plans or PBMs (the latter acting with and on behalf of Part D plans) have had contracts with in-network pharmacies to cap Part D charges and reimbursements at no more than the usual and customary charge: Argus, Cigna Healthcare, Express Scripts, Medco Health Solutions, Inc., Navitus Health Solutions, LLC, and Prime Therapeutics. Medicare Part D (PDP) (MA-PD) Programs, Pharmacy Audit Assistance Service National, Oct. 10, 2005, *available at* http://c ymcdn.com/sites/www wsparx.org/resource/resmgr/imported/PartD_PDP_MA-PD_%20PlanTable3_10-05.pdf.

59. Part D sponsors and PBMs have continued to mandate that the "usual and customary" price act as a price ceiling for Part D drug reimbursements. *See, e.g.* 2017 Amendment to OptumRx Part D Agreement, at pg. 1, *available at* https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-

manual/archivefaxblasts/2016/20160415_CignaMedicarePartDAPR-Exhibit1-A.pdf, CIGNA Pharmacy Management, Medicare Part D Supplement to Prescription Drug Card Program Requirements and Participating Pharmacy Manual, last updated May 2010, p. 3, available at https://www.cigna.com/pdf/MEDICARE_PART-D_Supplement_v2.pdf ("To participate in the CIGNA Medicare Part D Pharmacy Network, pharmacies must meet the following criteria... Willingness to accept the lower of usual and customary (U&C) or contracted rate."); Meridian RX, Pharmacy Operations Manual, Aug. 2017, p. 19, *available at* https://www.meridianrx.com/ContentDocuments/default.aspx?x=0vEt1t0yhctzm8c+V7YMUy SrH6hStoiir7E6JetQHleiaEFb5Cux/bhQzvRxjxAoTbsWpCenx9iHNE1+LyInqQ== (providing for a total price at the lesser of the ingredient cost, dispensing fee, and tax or the U&C).

60.    PBMs which provide or administer Part D benefits have otherwise made clear that the U&C price incorporates the prices offered pursuant to a drug discount program or price match guarantee. *E.g.*, Express Scripts PBM Provider Manual, Revised Dec. 2015, p. 127 ("To the extent not defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, inclusive of "loss leaders", frequent shopper or **special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date.** Additionally, the Usual and Customary Retail Price **must include any applicable discounts offered to attract customers including Members.**") (emphasis added); OptumRx Provider Manual, 2017, 2nd Edition, pg. 21 ("The U&C, or cash, price is the amount charged to the general public at the time of

19

dispensing for the same Drug Product **including all applicable customer discounts, such as advertised or sale prices, special customer, senior citizen, frequent shopper, price matching, coupons or other discounts**, a cash paying customer pays Network Pharmacy Provider for Drug Products, devices, products and/or supplies, including those which are offered by Network Pharmacy Providers without cost (a U&C of $0 is accepted).") (emphasis added); Prime Therapeutics Provider Manual, Mar. 12, 2015, pg. 30, *available at* https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Pharmacists/PharmacyProviderResources/ProviderManual/March12015PharmacyProviderManualEffective March12015.pdf ("Usual and Customary Charge (U&C)–The Participating Pharmacy will submit the **lowest price** the Participating Pharmacy would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed. This includes **any applicable discounts** including, but not limited to, senior discounts, **frequent shopper discounts and other special discounts offered to attract customers**.").

61. Network pharmacies which submit claims to Part D Plan plans must certify as to the accuracy, completeness, and truthfulness of the data related to payment and acknowledge that that information will be used to seek reimbursement from federal funds. 42 C.F.R. § 423.505(k).

62. Further, in-network pharmacies must use the National Council for Prescription Drug Program's (a standard setting organization) claim form to submit charges to Part D Sponsors (and/or the applicable PBMs). *See* 42 U.S.C. § 1320d-4(b) (mandating compliance with transaction standards set by HHS); 45 C.F.R. § 162.1102 (adopting the NCPDP standard as that which governs retail pharmacy electronic drug claims).

63. The NCPDP claim form includes a field for the pharmacy's "usual and customary charge" which is defined by the NCPDP as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed." "Usual and Customary Charge," Agency for Healthcare Research and Quality, United States Health Information Knowledgebase, https://ushik.ahrq.gov/ViewItemDetails?system=mdr&itemKey=62832000.

64. For out of network pharmacy claims, the Medicare pricing structure is established by regulation, 42 C.F.R. § 423.100, and in the Medicare Prescription Drug Benefit Manual ("Medicare Part D Manual"), Ch. 5, Section 10.2; both provide that the actual cost of a drug is the pharmacy's usual and customary price.

## TRICARE

65. TRICARE reimburses pharmacy claims for covered drugs at the lesser of the U&C, the MAC, or a contracted rate. TRICARE Reimbursement Manual 6010.58-M.

## Medicaid

66. For Medicaid, federal regulations set the "usual and customary" price as a pricing ceiling for prescription drug claims. 42 C.F.R. § 447.512(b) (providing that for certain drugs the lower of the usual and customary charge or the pharmacy's actual acquisition cost is the upper limit for payment); *see also* HHS/OIG, Comparing Pharmacy Reimbursement: Medicare Part D to Medicaid, Feb. 2009, Pg. 3, *available at* https://oig.hhs.gov/oei/reports/oei-03-07-00350.pdf ("Federal regulations require, with certain exceptions, that each State Medicaid agency's reimbursement for covered outpatient drugs not exceed (in the aggregate) the lower of the estimated acquisition cost for drugs (i.e., the ingredient cost) plus a reasonable dispensing fee or the provider's usual and customary charge to the public for the drugs.")

67. The states administering Medicaid coverage for prescription drugs set the usual

and customary charge as a prescription drug price ceiling as well. The relevant state laws, regulations, or Medicaid manuals establish that a pharmacy is to bill and be reimbursed for covered drugs at the lowest of various pricing metrics, including the usual and customary charge:

a. **Connecticut** Medicaid reimburses covered drugs at the lesser of:

   i. The U&C;
   ii. The AWP plus a dispensing fee; or
   iii. The EAC plus a professional fee.

Regs. Conn. St. Agencies § 17-2-97.

b. **Delaware** Medicaid reimburses covered drugs at the lesser of:

   i. The U&C;
   ii. The state MAC;
   iii. The NADAC or if a NADAC is not available, the Average Wholesale Price minus 19%; or
   iv. The EAC plus a dispensing fee for entities that qualify for special purchasing.

Delaware Medical Assistance Program Pharmacy Provider Policy Manual, § 4.1.4.

c. **District of Columbia** Medicaid reimburses covered drugs at the lesser of:

   i. The U&C; or
   ii. The allowable cost as set forth by regulation.

CDCR § 29-2710.5(a)-(b) (prior version effective March 12, 2013).

d. **Georgia** Medicaid reimburses covered drugs at the lesser of:

   i. The U&C;
   ii. The Select Specialty Pharmacy Rate (SSPR) plus a Professional Dispensing Fee ("PDF");
   iii. The NADAC plus a PDF;
   iv. The Georgia EAC plus a PDF;
   v. the Georgia MAC plus a PDF; or
   vi. The FUL plus a PDF.

Georgia Department of Community Health Division of Medical Assistance, Policies

and Procedures for Pharmacy Services, Part II, Section 1001.

e. **Maine** Medicaid reimburses covered:

    i. Generic drugs at the lesser of:
        1. The U&C;
        2. an AWP;
        3. an adjudsted WAC;
        4. the FUL; or
        5. the Maine MAC plus a dispensing fee.

MaineCare Benefits Manual, Code Me. R. tit. 10-144 Ch. 101, Ch. 2, § 80.09;

    ii. Brand-name drugs at the lesser of:
        1. The U&C;
        2. An adjusted AWP; or
        3. An adjusted WAC.

MaineCare Benefits Manual, Code Me. R. tit. 10-144 Ch. 101, Ch. 2, § 80.09.

f. **Maryland** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C; or
    ii. The allowable cost as set out Md. Code Regs. 10.09.03.07(H)(1) plus a dispensing fee;

Md. Code Regs. 10.09.03.07(I.).

g. **Massachusetts** Medicaid reimburses covered:

    i. Multiple-source drugs at the lesser of:
        1. The U&C;
        2. The FUL plus a dispensing fee;
        3. The AAC plus a dispensing fee; or
        4. The state MAC plus a dispensing fee.

101 Code Mass. Regs. 331.04(1);

    ii. All other drugs (except for drugs dispensed pursuant to the 340B program) at the lesser of:
        1. The U&C;
        2. The AAC plus a dispensing fee; or
        3. The state MAC plus a dispensing fee.

101 Code Mass. Regs. 331.04(3).

h. **New Hampshire** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C;
    ii. The AAC per the NADAC if available, plus a dispensing fee;
    iii. The WAC if a NADAC price is unavailable, plus a dispensing fee;
    iv. The state MAC, plus a dispensing fee; or
    v. The FUL, plus a dispensing fee.

NH ADC HE-W 570.14(a)(2).

i. **New York** Medicaid reimburses:

    i. Generic drugs at the lesser of:
        1. The U&C;
        2. The NADAC (or, if no NADAC is available, an adjusted WAC);
        3. The FUL; or
        4. The state MAC;

    N.Y. Soc. Serv. Law § 367-a(9.)(b)(i)(A).

    ii. Brand name drugs (not provided pursuant to the 340B program) at the lesser of:
        1. The U&C; or
        2. The NADAC (or, if no NADAC is available, an adjusted WAC);

N.Y. Soc. Serv. Law § 367-a(9.)(b)(ii)(A).

j. **North Carolina** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C; or
    ii. AAC.

North Carolina, North Carolina Division of Medical Assistance Outpatient Pharmacy Medicaid and Health Choice Clinical Coverage Policy No. 9, § B.4.

k. **Pennsylvania** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C;
    ii. The EAC plus a dispensing fee; or
    iii. The state MAC plus a dispensing fee.

55 Pa. Code § 1121.55.

l. **Rhode Island** Medicaid reimburses:

    i. Multiple source drugs for which an upper payment limit has been established pursuant to 42 CFR §447.331(a), at the lesser of :
        1. The U&C;
        2. The upper limit pursuant to 42 CFR §447.331; or
        3. The EAC
    ii. Other drugs (including brand name drugs) at the lesser of:
        1. The U&C; or
        2. The EAC;

Rhode Island Medicaid Provider Manual: Pharmacy Coverage Policy, *available at*

http://www.eohhs.ri.gov/ProvidersPartners/ProviderManualsGuidelines/Medicaid

ProviderManual/Pharmacy/PharmacyCoveragePolicy.aspx, *see also* 40 R.I. Gen.

Laws Ann. § 40-8-4.1(a).

m. **South Carolina** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C;
    ii. the FUL, plus a dispensing fee;
    iii. the state MAC, plus a dispensing fee; or
    iv. the WAC, plus a dispensing fee.

South Carolina Healthy Connections (Medicaid) Provider Manual: Pharmacy

Services, 2-41.

n. **Vermont** Medicaid reimburses covered drugs at the lesser of:

    i. The U&C; or
    ii. The ingredient price plus a dispensing fee.

12-7 Code Vt. R. § 5: 7501.3.

o. **Virginia** Medicare reimburses covered drugs at the lesser of:

    i. The U&C;

25

    ii.  An adjusted EAC;
    iii.  The FUL, plus a dispensing fee;
    iv.  An adjusted WAC; or
    v.  The MAC.

12 Va. Admin. Code 30-80-40.

68.    Accordingly, under both the federal and relevant state legal regimes governing the payment of prescription drug claims charged to Medicare or Medicaid, a pharmacy cannot charge, or be reimbursed, beyond its usual and customary charge. The one exception is in the case of in-network Part D providers whose contracts do not use the usual and customary charge as a price ceiling. Under both the federal and relevant state legal regimes, the "usual and customary charge," is the price that Defendants' pharmacies charged to the cash payers, i.e. the charges to those participating in the various iterations of Defendants' prescription drug discount programs or through their price match guarantee.

## V.    DEFENDANTS' SCHEME

### a.    Structure of Defendants' Pharmacies

69.    Defendant Giant Food of Maryland, LLC operates food stores and pharmacies throughout Maryland, Delaware, Virginia, West Virginia, and the District of Columbia under the name "Giant."

70.    Within the Ahold organization, Giant Food of Maryland, LLC is sometimes referred to as "Giant-Landover," with Landover, Maryland being the city in which its headquarters is located. For ease of reference, Relator will use the "Giant-Landover" designation throughout the remainder of the Complaint.

71.    Giant Foods, LLC operates food stores and pharmacies throughout Pennsylvania, Maryland, Virginia, and West Virginia under the names "Giant" and "Martin's."

72.   Within the Ahold organization, Giant Foods, LLC is sometimes referred to as "Giant-Carlisle," with Carlisle, Pennsylvania being the city in which its headquarters is located. For ease of reference, Relator will use the "Giant-Carlisle" designation throughout the remainder of the Complaint.

73.   For organizational and management purposes, Giant-Carlisle food stores are divided into districts.

74.   The DuBois Martin's Food Store, the store in which Relator's pharmacy is located, is in Giant-Carlisle District 144.

75.   On information and belief, Giant-Landover food stores, as well as the grocery stores under Defendants' other grocery store brands, are similarly divided into districts.

76.   The DuBois Martin's Pharmacy fills approximately 900 to 1,000 prescriptions in an average week.  Approximately 50% or more of those prescriptions are paid for, in whole or in part, by a government healthcare program.

77.   Each Giant-Carlisle pharmacy is staffed with a Pharmacy Manager, one or more Staff Pharmacists, and one or more Pharmacy Associates (otherwise known as Pharmacy Technicians). On information and belief, Giant-Landover pharmacies, as well as the other pharmacies operated by Defendants, are similarly staffed.

78.   Pharmacy Associates provide support to Staff Pharmacists and Pharmacy Managers. They intake and fill prescriptions, and they transfer prescriptions from other pharmacies.  Among their primary responsibilities is to process the transactions of customers who are picking up their prescriptions, though occasionally Staff Pharmacists or even Pharmacy Managers perform this task when necessitated by workflow and employee coverage.

79.   Pharmacy Associates report to the Pharmacy Manager, though if the Pharmacy

27

Manager is not on duty, the Staff Pharmacist on duty has supervisory authority over the Pharmacy Associates.

80. Staff Pharmacists, such as Relator, are primarily responsible for dispensing medication and providing customers with immunizations, education on diabetes and other diseases and disorders, and medication therapy management services.

81. Staff Pharmacists report to the Pharmacy Manager.

82. Pharmacy Managers are licensed pharmacists who, in addition to dispensing medication and providing customers with immunizations, disease education, and medication therapy management services, are chiefly responsible for the day-to-day operations of their pharmacies.

83. Each pharmacy employs its own Pharmacy Manager, and each Pharmacy Manager reports to the Store Manager, who has supervisory authority over both the pharmacy and the food store operations.

84. During much of the time period relevant to this Complaint, Relator's Pharmacy Manager was Wendy States. Ms. States was Relator's Pharmacy Manager from at least 2010 until she resigned from her position in May of 2018.

85. From the beginning of the time period relevant to this Complaint to March 2015, Relator's Store Manager was Joseph Kelly. From March 2015 to July 2016, his Store Manager was Chris Chisholm. John Petersal was Relator's pharmacy manager from July 2016 through September 2017. Jeffrey Wheeler has been the pharmacy manager from September 2017 to the present.

### b. The Usual and Customary Pricing Fraud

#### i. The Structure of Defendants' Prescription Drug Discount Programs

86. From at least May 22, 2013 through September of 2017, Martin's pharmacies provided a drug discount program titled the "Prescription Savings Program."

87. Ahold Delhaize's other brands, such as Food Lion, Giant (Giant Carlisle and Giant Landover), and Hannaford provided programs materially similar to the PSP during this time period.

88. Giant's and Stop & Shop's similar programs were also called the "Prescription Savings Program."

89. Food Lion offered a similar program called the "Healthy Saver" program.

90. Hannaford offered a similar program called the "Healthy Saver" or "Healthy Saver Plus" program.

91. On information and belief, the usual and customary pricing scheme was effectuated in substantial uniformity throughout Ahold Delhaize's various grocery-pharmacy brands. Thus, while Relator's knowledge is largely related to the PSP as conducted at Martin's, Giant, and Stop & Shop Stores, on information and belief, the same fraudulent discount drug program pricing scheme was employed through the Food Lion and Hannaford pharmacy brands as well.

92. All the drug discount programs at issue in this Complaint were, at least nominally, administered by Medical Security Card Company, LLC ("MSC"), an Arizona company which developed and marketed drug discount programs for retail pharmacies to companies like Defendants.

93. Moreover, Ahold USA's internal documents refer to the PSP as being uniform

29

across that entity's brands, noting, for example, that, with the exception of the company's New Jersey locations, "[a]ll Giant/Stop & Shop/Martins [sic] Pharmacies accept the [PSP] card" which allowed customers to avail themselves of the PSP's drug discounts.

94.     The PSP benefits were not a one time, limited, or otherwise restricted offer. Rather, the PSP was open to the general public throughout the tenure of the program: May 22, 2013 through September 13, 2017.  As Giant's PSP enrollment form noted, "anyone can sign up."

95.     To avail oneself of the PSP's benefits, a customer would simply need to pay a $10 surcharge to the pharmacy and fill out the requisite paperwork.  There was no other barrier to entry other than the nominal $10 "enrollment fee."  Participation in the program would apply to an entire household, not just the individual who initially signed up and paid the $10 fee.  The program was offered to the general public, including those with health insurance and those without health insurance.

96.     Accordingly, anyone in the general public who paid the $10 fee could participate in the arrangement.

97.     From May 22, 2013 until January 2017, the $10 enrollment fee was merely a smoke-screen.  Once a customer signed up for the PSP, they were provided (except for locations in New York and Rhode Island) a $10 off coupon for a purchase from the grocery store side of the Martin's (or Giant/Stop & Shop) store.  Accordingly, the customers effectively paid nothing to participate in the Defendants' discount drug programs.

98.     Later, in or around January of 2017, Ahold instructed its pharmacy personnel, including, Relator, that Ahold would no longer be charging the $10 PSP enrollment fee and would no longer require individuals to fill out the already minimal paperwork in order to take

part in the discount program.

99. Ahold encouraged their pharmacy personnel to market the program to customers. As a matter of course, pharmacy personnel at Relator's Martin's location would suggest to cash payers that they avail themselves of the PSP's drug discount benefits.

100. Once a customer participated in the PSP, the program afforded them deep discounts on thousands of drugs if they paid "cash" (i.e. if they lacked insurance or otherwise chose not to use their insurance coverage to pay for the drug).

101. From the start of the PSP, a wide range of generic drugs ("Tier 1") were offered for $3.99 for a 30 day supply and $9.99 for a 90 day supply. Various other generic drugs ("Tier 2") were offered through the PSP for $9.99 for a 30 day supply and $27.99 for a 90 day supply. A third tier was later added, incorporating other drugs at different deeply discount rates.

102. Certain "women's health" drugs were offered at an $8.99 rate for a 30 day supply throughout the term of the PSP.

103. PSP discounts in the range of 10% to 30% were offered for the majority of other generic drugs as well as brand name drugs throughout the term of the PSP.

104. MSC touted the profitability of the program, explaining that "MSC clients experience an average 35% increase in drug spend and 31% increase in prescription sales – each month. By driving traffic, MSC also helps grow front-of-store grocery-related sales and other services."

105. As Ahold explained in its internal documents, the PSP programs provided various benefits to Ahold, including: "[i]ncreased customer loyalty [at the] Pharmacy and Store," the "flexibility to **maximize overall U&C [usual and customary drug pricing] strategy**,"

"[i]ncreased profit margins," and the "[c]onver[sion of] numerous [competitor] discount card customers." (emphasis added)

106. Accordingly, programs like the PSP are particularly appealing to companies, like Defendants, that operate supermarkets, which can entice customers to enter the store for the pharmacy discounts in the expectation that the customers thereafter spend additional sums on grocery items.

107. Moreover, many of the deeply discounted drugs in the PSP are commonly prescribed maintenance medications (e.g., citalopram, haloperidol, lovastatin, metformin, and pravastatin). Accordingly, individuals participating in the program will often (a) require periodic refills of such medications (and attendant visits to the grocery store-pharmacy) and (b) require additional prescriptions which are either not covered by the PSP or covered by the program but at a lesser discount.

108. Ahold USA's internal documents show that the program was a success. For fiscal year 2013, the first year that the PSP was in effect, 188,755 households had signed up for the program.

109. Data from Relators' Martin's pharmacy for the last year that the program was in effect (September 1, 2016 through September 1, 2017), indicated that the overwhelming majority of cash (i.e. non-insurance) prescription drug transactions were made pursuant to the PSP.

### ii. Defendants' Price Match Guarantees

110. From at least 2010 through the present, Ahold USA's pharmacies have offered the general public a price match guarantee. Through this policy, Ahold USA offers all cash paying members of the general public the opportunity to purchase prescription drugs at the prices

offered by its competitors.

111. Ahold USA's competitors, and thus Ahold USA's pharmacies themselves, routinely offered prescription drugs to the general public at prices below that which Ahold USA charged government insurers for the same drugs.

112. For example, during the relevant period Wal-Mart, which operates in the same regions as Ahold USA, routinely offered, and continues to offer, a wide range of prescription drugs at $4 for a 30-day prescription. Ahold USA provided, and continues to provide, a price match consistent with Wal-Mart's lower prices to cash paying customers for those same drugs.

113. Ahold USA knowingly failed to incorporate its lower price match guarantee prices into its U&C metric and the charges it submitted to government insurers. For example, on September 6, 2016 and October 1, 2016, Relator's Martin's pharmacy charged Medicare plans $97.88 for Lisinopril 10 mg tablets when Martin's would have price matched Wal-Mart's price for that same drug at $4. The $4 price match amount should have been the price charged to Medicare in those instances.

114. Accordingly, the U&C charges were similarly inflated by Ahold USA's failure to incorporate its price match pricing when billing insurers.

### iii. Defendants' Fraudulent and Systemic Overcharges

115. The PSP's prices and those associated with the price match guarantee were offered, without restriction, to cash payers. The prices therefore amounted to Defendants' "usual and customary charges" as that term is used in the context of Medicare, Medicaid, TRICARE, and other health insurance plans.

116. As CMS explained in 2006 in reference to Wal-Mart's drug discount program (which is materially similar to Defendants' programs):

For example, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price. To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay.

117. Yet Defendants knowingly and systematically failed to report the "usual and customary charges" afforded through the PSP and price match guarantee to government payers including Medicare, TRICARE, and Medicaid. Rather, Defendants systematically reported and submitted for payment to government insurers "usual and customary charges" that were far in excess of the prices offered under the PSP and the price match guarantee.

118. As a result of Defendants' usual and customary pricing fraud, insurers like Medicare, TRICARE, and Medicaid were duped into reimbursing prescription drug claims at grossly excessive prices.

119. By failing to incorporate PSP's prices and those of the price match guarantee into their usual and customary charge submissions to Medicare, TRICARE, and Medicaid, the Defendants made the price ceiling associated with the "usual and customary charge" meaningless.

120. Billing data from Relator's Martin's pharmacy shows that, through the Martin's drug claims system, government insurers were systemically overcharged in the manner set forth in the preceding paragraphs.

121. For claims submitted to Medicare, TRICARE, and Medicaid (and other insurers),

Defendants automatically inserted an inflated U&C price into the pharmacy's electronic claim form. This data field corresponded with field "426-DQ," the field used in Medicare and Medicaid claims forms for the "usual and customary charge." The U&C price submitted to the insurers did not reflect the far lower actual U&C price under PSP and the price match guarantee.

122. Moreover, as shown in the claims submitted to Medicare, the "423-DN" field used to indicate the basis for the submitted charge was based on the average wholesale price, a charge far in excess of the actual U&C under the PSP and price match guarantee. This field should have shown the *actual*, and far lower, usual and customary price consistent with Defendants' drug discount and price match programs.

123. The below table summarizes examples where Relator's Martin's pharmacy dispensed a prescription under the PSP and examples where that same pharmacy dispensed a the same drug for a Medicare beneficiary along with the amount of the charge submitted to the Medicare plan. In each case, the charge submitted to Medicare was far higher than the price offered through the PSP (which would reflect the *actual* U&C price).

| Drug/Date of Claim | Payment Method | Artificially Inflated Charge Listed as U&C in Martin's System[1] | Total Charge to Government | Patient Pay Amount (PSP price or co-pay) | Actual U&C | Difference between the *Actual* U&C and the Charge to Government |
|---|---|---|---|---|---|---|
| Lisinopril 10 mg 12/7/16 | PSP | $21.09 | N/A | $3.99 | $3.99 (for 30 day supply) | $28.64 (717% overcharge) |
| Lisinopril 10 mg 12/7/16 | OptumRx Medicare Advantage | $21.09 | $32.63 (based on AWP) | $5.00 | | |

---

[1] The sums in this column are associated, within the Martin's pharmacy system, with field 426-DQ.

| | | | | | | |
|---|---|---|---|---|---|---|
| Montelukast Sodium 10 mg 9/7/16 | PSP | $166.99 | N/A | $34.40 | | |
| Montelukast Sodium 10 mg 8/31/16 | Cigna Medicare Part D | $166.99 | $170.11 (based on AWP) | $ 7.09 | $7.09 | $170.11 (495% overcharge) |
| Lisinopril 10 mg 9/6/16 | PSP | $63.29 | N/A | $9.99 | | |
| Lisinopril 10 mg 9/6/16 | Aetna Medicare Part D | $63.29 | $69.88 (based on AWP) | $28 | $9.99 (for 90 day supply) | $69.88 (699% overcharge) |
| Simvastatin 10 mg 10/7/16 | PSP | $63.49 | N/A | $3.99 | | |
| Simvastatin 10 mg 10/1/16 | Caremark Medicare Advantage | $63.49 | $92.10 (based on AWP) | $0 | $3.99 | $92.10 (2,308% overcharge) |
| Lisinopril 10 mg 9/30/16 | PSP | $63.29 | N/A | $9.99 | | |
| Lisinopril 10 mg 10/1/16 | Caremark Medicare Advantage | $63.29 | $95.99 (based on AWP) | $2.89 | $9.99 | $95.99 (961% overcharge) |

124. Relator also saw charges to Medicaid beyond the usual and customary charge. For example, on June 9, 2017, Martin's charged Pennsylvania Medicaid $35.10 for a Penicillin

36

(500 mg tables) prescription that was offered through the PSP at $3.99, an 879% overcharge.

125. During a phone call with pharmacy staff in late August 2017, Ahold explained to its pharmacy personnel that the program would soon be terminated. Ahold explained that "[t]his is not something the company wants to do, but something we have to do from a legal, and third party perspective." The PSP was terminated effective September 13, 2017, however, Ahold continues to offer the price match guarantee.

126. In winding down the PSP, Ahold USA decided to provide a different drug discount program ("the new drug discount program") to replace the PSP. Through the new drug discount program, Ahold USA pharmacies would fill certain drugs accordingly to a drug discount schedule. However, Ahold USA, specifically noted that the drug prices under the new drug discount program, unlike under the PSP, were the "usual and customary charges" that would be charged to insurers (and cash paying customers), stating:

> **Will the patient receive the new low generic price if the prescription is billed to his or her insurance plan?**
> [Answer]. Yes. Again, please think of these changes as shifting to a pricing strategy vs. a defined program. The new low price on over 200 generic drugs is provided to BOTH cash paying customers as well as submitted to third party insurance plans. This new low price is our usual and customary charge for these 200 drugs.

127. Medicare, TRICARE, and Medicaid have been damaged by the usual and customary pricing fraud at issue. First, the government programs have been damaged directly, on a dollar-to-dollar basis for each inflated claim submitted by Defendants.

128. Beneficiaries are also harmed by Defendants' overbilling practices in that the higher prices charged to insurers result in higher copay amounts charged to beneficiaries.

129. In addition, government healthcare programs have also been damaged because Defendants' excessive charges have pushed Medicare beneficiaries to and through the donut

37

hole (the gap in coverage where Medicare beneficiaries prescription drug costs are not covered) far more quickly than they would be had Defendants' submitted the actual, far lower usual and customary charges to Medicare. Accordingly, Medicare beneficiaries, who have to shoulder an enormously more burdensome out of pocket cost during the donut hole are harmed by Defendants' program.

130. Relatedly, the federal government is also damaged vis-à-vis the hastening of the Medicare donut hole in that, by virtue of being pushed up to and through the donut hole more quickly, the government must, after the donut hole has been "completed," pay nearly all of the beneficiaries drug costs (referred to as "catastrophic costs" or "catastrophic coverage") much sooner than if Defendants had submitted the actual usual and customary charges. 42 C.F.R. § 423.104(d). That is, once a beneficiary is pushed through the donut hole, the government's prescription drug burden is greatly enhanced.

131. Defendants' prescription price fraud is material to the government's decision to pay for the prescription drugs in that the fraud goes to the essence of the bargain: the price that government-funded healthcare programs pay for prescription drugs.

132. Defendants were, at all relevant times, aware that the prescription drug charges they presented to government insurers, and the sums they received in response thereto, were improper and excessive.

## COUNT I

### (UNITED STATES EX REL. LABENNE v. ALL DEFENDANTS)
### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A), (B)

133. Relator re-alleges Paragraphs 1 through 132 as though set forth fully herein.

134. Defendants violated the federal False Claims Act by submitting claims, or causing

the submission of claims, for reimbursement from federal healthcare programs, including Medicare Part D, TRICARE, and Medicaid, knowing that they were ineligible for the payments demanded.

135. Claims submitted, or that were caused to be submitted, by the Defendants for prescriptions that were artificially inflated violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

136. Defendants knowingly caused to be made or used false records or statements, material to false claims, in order to get false or fraudulent claims paid or approved for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

137. The United States government, unaware of Defendants' illegal conduct, made payment or approved for payment the false and fraudulent claims, which resulted in damages in an amount to be determined.

**WHEREFORE**, Relator requests the following relief:

A.    Damages recoverable by the United States in the amount of each and every false or fraudulent claim and trebled as provided by 31 U.S.C. § 3729(a), to the extent such multiplied damages fairly compensate the United States for losses resulting from Defendant's illegal conduct;

B.    A civil penalty of between $11,181 and $22,363 for each violation, as provided by 31 U.S.C. §3729(a), recoverable by the United States;

C.    Twenty-five percent of the proceeds of this action to the Relator if the United States elects to intervene, and 30% of the proceeds if it does not;

D.    All costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

E.    Any other relief, whether in law or in equity, to which the United States and/or Relator are entitled.

## COUNT II

**(DELAWARE EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V.,
KONINKLIJKE AHOLD N.V., GIANT FOOD STORES, LLC, AND GIANT FOOD OF
MARYLAND, LLC)
DELAWARE FALSE CLAIMS AND REPORTING ACT
Del. Code Ann. tit. 6, § 1201 *et seq.***

138.  Relator re-alleges Paragraphs 1 through 137 as though fully set forth herein.

139.  This is a claim for damages and penalties under the Delaware False Claims and Reporting Act.

140.  By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Delaware for payment or approval, in violation of Delaware Code title 6, § 1201(a)(1).

141.  By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements, and omitted material facts to induce the State of Delaware to approve or pay such false and fraudulent claims. Accordingly, Defendants violated Delaware Code title 6, § 1201(a)(2).

142.  The State of Delaware, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

143.  By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.    Damages recoverable by the State of Delaware in the amount of each and every false or fraudulent claim and trebled as provided by Delaware Code title 6, § 1201, to the extent such multiplied damages fairly compensate the State of Delaware for losses resulting from Defendants' illegal conduct;

B.    A civil penalty of not less than $5,500 or more than $11,000 for each violation, as provided by Delaware Code title 6, § 1201, recoverable by the State of Delaware;

C.    Twenty-five percent of the proceeds of this action to the Relator if the State of Delaware elects to intervene, and 30% of the proceeds if it does not;

D.    All costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

E.    Any other relief, whether in law or in equity, to which the State of Delaware and/or Relator are entitled.

## COUNT III

**(MARYLAND EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., GIANT FOOD STORES, LLC, AND GIANT FOOD OF MARYLAND, LLC)**
**MARYLAND FALSE CLAIMS ACT**
**Md. Code Gen. Prov. § 8-101 *et seq.***

144.  Relator re-alleges Paragraphs 1 through 143 as though fully set forth herein.

145.  This is a claim for damages and penalties under the Maryland False Claims Act.

146.  By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Maryland for payment or approval, in violation of Maryland Code General Provisions § 8-102(b)(1).

147. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements, and omitted material facts to induce the State of Maryland to approve or pay such false and fraudulent claims. Accordingly, Defendants violated Maryland Code General Provisions § 8-102(b)(2).

148. The State of Maryland, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

149. By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.     Damages recoverable by the State of Maryland in the amount of each and every false or fraudulent claim and trebled as provided by Maryland Code General Provisions § 8-102(c)(1)(ii), to the extent such multiplied damages fairly compensate the State of Maryland for losses resulting from Defendants' illegal conduct;

B.     A civil penalty of not more than $10,000.00 for each violation, as provided by Maryland Code General Provisions § 8-102(c)(1)(ii), recoverable by the State of Maryland;

C.     Twenty-five percent of the proceeds of this action to the Relator if the State of Maryland elects to intervene, and 30% of the proceeds if it does not;

D.     All costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

E.     Any other relief, whether in law or in equity, to which the State of

Maryland and/or Relator are entitled.

## COUNT IV

### (VIRGINIA EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., GIANT FOOD STORES, LLC, GIANT FOOD OF MARYLAND, LLC, FOOD LION LLC, DELHAIZE GROUP, N.V./S.A., AND DELHAIZE AMERICA, LLC)
### VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. §§ 8.01-216.1, *et seq.*

150. Relator re-alleges Paragraphs 1 through 149 as though set forth fully herein.

151. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

152. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the Commonwealth of Virginia for payment and approval, in violation of Va. Code Ann. § 8.01-216.3(1).

153. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the Commonwealth of Virginia to approve or pay such false and fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(2).

154. The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

155. By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator requests the following relief:

A.     Damages recoverable by the Commonwealth of Virginia in the

43

amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the Commonwealth of Virginia for losses resulting from Defendants' illegal conduct;

B.    A civil penalty of between $11,181 and $22,363    for each violation, as provided by Virginia Code § 8.01-216.3, recoverable by the Commonwealth of Virginia;

C.    Twenty five percent (25%) of the proceeds of this action to the Relator if the Commonwealth of Virginia elects to intervene, and thirty percent (30%) if it does not;

D.    Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.    Such other relief as the Court deems just and appropriate.

## COUNT V

**(CONNECTICUT EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., AND STOP & SHOP SUPERMARKET COMPANY LLC)**
**CONNECTICUT FALSE CLAIMS ACT**
**Conn. Gen. Stat. § 4-274, *et seq.***

156. Relator re-alleges Paragraphs 1 through 155 as though set forth fully herein.

157. This is a claim for treble damages and penalties under the Connecticut False Claims Act.

158. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Connecticut for payment and approval, in violation of Conn. Gen. Stat. § 4-275(a)(1).

44

159. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the State of Connecticut to approve or pay such false and fraudulent claims, in violation of Conn. Gen. Stat. § 4-275(a)(2).

160. The State of Connecticut, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

161. By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.    Damages recoverable by the State of Connecticut in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the State of Connecticut for losses resulting from Defendants' illegal conduct;

B.    A civil penalty of not less than $5,500.00 or more than $11,000.00 for each violation, as provided by Conn. Gen. Stat. § 4-275, recoverable by the State of Connecticut;

C.    Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Connecticut elects to intervene, and thirty percent (30%) if it does not;

D.    Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.      Such other relief as the Court deems just and appropriate.

## COUNT VI

### (GEORGIA EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., DELHAIZE GROUP, N.V./S.A., DELHAIZE AMERICA, LLC, AND FOOD LION, LLC) GEORGIA STATE FALSE CLAIMS ACT Ga. Code §§ 49-4-168, *et seq.*

162. Relator re-alleges Paragraphs 1 through 161 as though set forth fully herein.

163. This is a claim for treble damages and penalties under the Georgia State False Claims Act.

164. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Georgia for payment and approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

165. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the State of Georgia to approve or pay such false and fraudulent claims, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

166. The State of Georgia, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

167. By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator requests the following relief:

A.      Damages recoverable by the State of Georgia in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied

damages fairly compensate the State of Georgia for losses resulting from Defendants' illegal conduct;

B.      A civil penalty of between $11,181 and $22,363      for each violation, as provided by Ga. Code Ann. § 49-4-168.1, recoverable by the State of Georgia;

C.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Georgia elects to intervene, and thirty percent (30%) if it does not;

D.      Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.      Such other relief as the Court deems just and appropriate.

## COUNT VII

**(MASSACHUSETTS EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., STOP & SHOP SUPERMARKET COMPANY LLC, DELHAIZE GROUP, N.V./S.A., DELHAIZE AMERICA, LLC, AND HANNAFORD BROS. CO., LLC)**
**MASSACHUSETTS FALSE CLAIMS LAW**
**Mass. Gen. Laws ch. 12, § 5A, *et seq.***

168. Relator re-alleges Paragraphs 1 through 167 as though set forth fully herein.

169. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

170. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the Commonwealth of Massachusetts for payment and approval, in violation of Mass. Gen. Laws Ann. ch. 12, § 5B(a)(1).

171. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the

Commonwealth of Massachusetts to approve or pay such false and fraudulent claims, in violation of Mass. Gen. Laws Ann. ch. 12, § 5B(a)(2).

172. The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

173. By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.    Damages recoverable by the Commonwealth of Massachusetts in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the Commonwealth of Massachusetts for losses resulting from Defendants' illegal conduct;

B.    A civil penalty of between $11,181 and $22,363 for each violation, as provided by Mass. Gen. Laws Ann. ch. 12, § 5B, recoverable by the Commonwealth of Massachusetts;

C.    Twenty five percent (25%) of the proceeds of this action to the Relator if the Commonwealth of Massachusetts elects to intervene, and thirty percent (30%) if it does not;

D.    Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.    Such other relief as the Court deems just and appropriate.

## COUNT VIII

### (NEW HAMPSHIRE EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., DELHAIZE GROUP, N.V./S.A., DELHAIZE AMERICA, LLC, AND HANNAFORD BROS. CO., LLC)
### NEW HAMPSHIRE FALSE CLAIMS LAW
### N.H. Rev. Stat. Ann. § 167:61-b, *et. seq.*

174. Relator re-alleges Paragraphs 1 through 173 as though set forth fully herein.

175. This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

176. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of New Hampshire for payment and approval, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I.)(a).

177. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the State of New Hampshire to approve or pay such false and fraudulent claims, in violation of N.H. Rev. Stat. Ann. § 167:61-b(I.)(b).

178. The State of New Hampshire, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

179. By reason of Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator requests the following relief:

A. Damages recoverable by the State of New Hampshire in the amount of each and every false or fraudulent claim and trebled to the extent such

49

multiplied damages fairly compensate the State of New Hampshire for losses resulting from Defendants' illegal conduct;

B.      A civil penalty of not less than $5,000.00 or more than $11,000.00 for each violation, as provided by N.H. Rev. Stat. Ann. § 167:61-b, recoverable by the State of New Hampshire;

C.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of New Hampshire elects to intervene, and thirty percent (30%) if it does not;

D.      Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.      Such other relief as the Court deems just and appropriate.

## COUNT IX

### (NEW YORK EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., AND STOP & SHOP SUPERMARKET COMPANY LLC) NEW YORK FALSE CLAIMS ACT N.Y. State Fin. Law § 187, *et seq.*

180.  Relator re-alleges Paragraphs 1 through 179 as though set forth fully herein.

181.  This is a claim for treble damages and penalties under the New York False Claims Act.

182.  By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of New York for payment and approval, in violation of a N.Y. State Fin. Law § 189(1.)(a).

183.  By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the

State of New York to approve or pay such false and fraudulent claims, in violation of N.Y. State Fin. Law § 189(1.)(b).

184. The State of New York, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

185. By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.     Damages recoverable by the State of New York in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the State of New York for losses resulting from Defendants' illegal conduct;

B.     A civil penalty of not less than $6,000 or more than $12,000.00 for each violation, as provided by N.Y. State Fin. Law § 189, recoverable by the State of New York;

C.     Twenty five percent (25%) of the proceeds of this action to the Relator if the State of New York elects to intervene, and thirty percent (30%) if it does not;

D.     Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.     Such other relief as the Court deems just and appropriate.

## COUNT X

### (NORTH CAROLINA EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., DELHAIZE GROUP, N.V./S.A., DELHAIZE AMERICA, LLC, AND FOOD LION, LLC)
### NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. Ann. § 1-605, *et seq.*

186. Relator re-alleges Paragraphs 1 through 185 as though set forth fully herein.

187. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

188. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of North Carolina for payment and approval, in violation of a N.C. Gen. Stat. § 1-607(a)(1).

189. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the state of North Carolina to approve or pay such false and fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

190. The State of North Carolina, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

191. By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator requests the following relief:

    A.    Damages recoverable by the State of North Carolina in the amount of each and every false or fraudulent claim and trebled to the extent such

multiplied damages fairly compensate the State of North Carolina for losses resulting from Defendants' illegal conduct;

B.      A civil penalty of not less than $5,500 or more than $11,000.00 for each violation, as provided by N.C. Gen. Stat. § 1-607, recoverable by the State of North Carolina;

C.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of North Carolina elects to intervene, and thirty percent (30%) if it does not;

D.      Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.      Such other relief as the Court deems just and appropriate.

## COUNT XI

### (RHODE ISLAND EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., KONINKLIJKE AHOLD N.V., AND STOP & SHOP SUPERMARKET COMPANY LLC) RHODE ISLAND STATE FALSE CLAIMS ACT 9 R.I. Gen. Laws § 9-1.1-1, *et seq.*

192. Relator re-alleges Paragraphs 1 through 191 as though set forth fully herein.

193. This is a claim for treble damages and penalties under the Rhode Island State False Claims Act.

194. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Rhode Island for payment and approval, in violation of a 9 R.I. Gen. Laws § 9-1.1-3(a)(1).

195. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the

state of Rhode Island to approve or pay such false and fraudulent claims, in violation of 9 R.I. Gen. Laws § 9-1.1-3(a)(2).

196. The State of Rhode Island, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

197. By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.     Damages recoverable by the State of Rhode Island in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the State of Rhode Island for losses resulting from Defendants' illegal conduct;

B.     A civil penalty of not less than $5,500 or more than $11,000.00 for each violation, as provided by 9 R.I. Gen. Laws § 9-1.1-3, recoverable by the State of Rhode Island;

C.     Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Rhode Island elects to intervene, and thirty percent (30%) if it does not;

D.     Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.     Such other relief as the Court deems just and appropriate.

A.     Such other relief as the Court deems just and appropriate.

## COUNT XII

### (VERMONT EX REL. LABENNE v. KONINKLIJKE AHOLD DELHAIZE N.V., DELHAIZE GROUP, N.V./S.A., DELHAIZE AMERICA, LLC, AND HANNAFORD BROS. CO., LLC) VERMONT FALSE CLAIMS ACT Vt. Stat. tit. 32, § 630, *et seq.*

198. Relator re-alleges Paragraphs 1 through 197 as though set forth fully herein.

199. This is a claim for treble damages and penalties under the Vermont False Claims Act.

200. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the State of Vermont for payment and approval, in violation of a Vt. Stat. tit. 32, § 631(a)(1).

201. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the state of Vermont to approve or pay such false and fraudulent claims, in violation of Vt. Stat. tit. 32, § 631(a)(2).

202. The State of Vermont, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

203. By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A. Damages recoverable by the State of Vermont in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the State of Vermont for losses resulting from

Defendants' illegal conduct;

B.      A civil penalty of between $11,181 and $22,363 for each violation, as provided by Vt. Stat. tit. 32, § 631, recoverable by the State of Vermont;

C.      Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Vermont elects to intervene, and thirty percent (30%) if it does not;

D.      Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.      Such other relief as the Court deems just and appropriate.

## COUNT XIII

**(DISTRICT OF COLUMBIA EX REL. LABENNE v. KONINKLIJKE AHOLD
DELHAIZE N.V., KONINKLIJKE AHOLD N.V., AND
GIANT FOOD OF MARYLAND, LLC)
DISTRICT OF COLUMBIA FALSE CLAIMS ACT
D.C. Code § 2-381.01, et seq.**

204. Relator re-alleges Paragraphs 1 through 203 as though set forth fully herein.

205. This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

206. By virtue of the acts described above, Defendants knowingly presented and caused to be presented false and fraudulent claims to the District of Columbia for payment and approval, in violation of a D.C. Code § 2-381.02(a)(1).

207. By virtue of the acts described above, Defendants knowingly made, used, and caused to be made or used false records and statements and omitted material facts to induce the District of Columbia to approve or pay such false and fraudulent claims, in violation of D.C. Code § 2-381.02(a)(2).

208. The District of Columbia, unaware of the falsity of the records, statements and claims made, used, presented, and caused to be presented by Defendants, paid and approved claims that it would not have paid and approved had it known of Defendant's illegal inducements.

209. By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**WHEREFORE**, Relator requests the following relief:

A.    Damages recoverable by the District of Columbia in the amount of each and every false or fraudulent claim and trebled to the extent such multiplied damages fairly compensate the District of Columbia for losses resulting from Defendants' illegal conduct;

B.    A civil penalty of not less than $5,500 or more than $11,000.00 for each violation, as provided by D.C. Code § 2-381.02, recoverable by the District of Columbia;

C.    Twenty five percent (25%) of the proceeds of this action to the Relator if the District of Columbia elects to intervene, and thirty percent (30%) if it does not;

D.    Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

E.    Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK RASPANTI, LLP

Michael A. Morse, Esq.
Alexander M. Owens, Esq.
PA Bar No.: 80507, 319400
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
Tel.: (215) 320-6200
Fax: (215) 981-0082
MAM@Pietragallo.com
AMO@Pietragallo.com

*Counsel for Relator Lawrence LaBenne*

Date:  July 17, 2018

3583397

Page 1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Relator's *Qui Tam* Complaint has been served on this 17th day of July, 2018, upon the following parties:

### GOVERNMENT COUNSEL

### VIA CERTIFIED MAIL

Jefferson Sessions, Esquire
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Scott W. Brady, Esquire
United States Attorney for the
Western District of Pennsylvania
United States Attorney's Office, Western District of Pennsylvania
Joseph F. Weis, Jr. U.S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

Mark Herring, Esquire
Attorney General of Virginia
Virginia Attorney General's Office
202 North Ninth Street
Richmond, VA 23219

Christopher M. Carr, Esquire
Attorney General of Georgia
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

Brian Frosh, Esquire
Attorney General of Maryland
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Page 2

Maura Healey, Esquire
Attorney General of Massachusetts
Office of the Attoreny General
One Ashburton Place
Boston, MA 02108-1518

Josh Stein, Esquire
Attorney General of North Carolina
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001

Peter Kilmartin, Esquire
Attorney General of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Karl A. Racine, Esquire
Attorney General for the District of Columbia
441 4th Street, NW
Washington, DC 20001

George Gepson, Esq.
Attorney General
Attorney General Office for the State of Connecticut
P.O. Box 120
Hartford, CT 06141

Matthew Denn, Esq.
Attorney General
Delaware Departmetn of Justice
820 N. French St.
Wilmington, DE 19801

Barbara Underwood, Esq
Attorney General
New York State Office of the Attorney General
The Capitol
Albany, NY 12224

Joseph Foster, Esq.
New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

2

Page 3

T.J. Donovan, Esq.
Attorney General
Office of the Vermont Attorney General
109 State St.
Montpelier, VT 05609

.

By: /s/ Michael A. Morse


PIETRAGALLO GORDON ALFANO
BOSICK RASPANTI, LLP

Michael A. Morse
Alexander M. Owens
PA Bar No.: 80507, 319400
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
Tel.: (215) 320-6200
Fax: (215) 981-0082
MAM@Pietragallo.com
AMO@Pietragallo.com

*Counsel for Relator Lawrence LaBenne*